## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

NIKITA MAYFIELD a/k/a NICK MAYFIELD,

      Plaintiff,

      v.                          Case No. 5:18-cv-04036-HLT

TARGET CORPORATION,

      Defendant.

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Nikita Mayfield brings this action against his employer, Defendant Target Corporation, asserting various employment-related claims, including: (1) disability discrimination under the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12101, et seq. (Count I); (2) failure to accommodate under the ADA (Count II); (3) race-based disparate treatment and harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq. (Count III); and (4) retaliation in violation of the ADA, Title VII, and the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, et seq. (Counts IV-VI). Doc. 64. Defendant moves for summary judgment on each claim. Doc. 66.

The Court grants Defendant's request for summary judgment on all of Plaintiff's claims. The Court finds that, although Plaintiff has met the prima facie burden on his race-based disparate treatment and FMLA retaliation claims, Plaintiff cannot rebut Defendant's legitimate, nondiscriminatory reasons for taking adverse employment actions against him by showing that those reasons were mere pretext for discrimination. And the Court finds that Plaintiff cannot establish a prima facie case on his disability discrimination, failure to accommodate, race-based harassment, and ADA and Title VII retaliation claims; thus, the Court need not even consider pretext for those claims. The Court accordingly concludes that summary judgment is warranted.

## I. BACKGROUND[1]

### A. Plaintiff's Anxiety and FMLA Leave

Defendant hired Plaintiff in 2004 as a warehouse worker at its Topeka distribution center (the "Center"), where he still works today. Doc. 64 at 3 ¶¶ (a)(v)-(vi). In 2014, Plaintiff's treating physician, Dr. James Barnett, diagnosed him with generalized anxiety disorder. Doc. 67-23 at 10:8-17. Plaintiff testified that his anxiety disorder causes him to lose sleep, makes him irritable, and causes him to have difficulty in social interactions, thinking, and concentrating. It also caused him to lose weight and have suicidal thoughts in 2017. Doc. 67-1 at 47:18-49:8.

Defendant contracts with The Reed Group to administer leaves of absence for employees, including leave taken pursuant to the FMLA. Doc. 67-2 at 4:19-5:9. The Reed Group approves leave and tracks time used. *Id.* at 3:12-18, 5:25-6:4. It notifies Defendant when it approves or denies an employee's request for FMLA leave but does not inform Defendant of the underlying medical condition providing the basis for leave. *Id.* at 33:5-14; Doc. 67-9 at 10:13-22. Since 2013, Plaintiff has taken FMLA leave on numerous occasions. Doc. 67-1 at 17:9-18, 18:4-8, 19-22, 23:22-24:7. He has never been denied FMLA leave and continues to use it. *Id.* at 24:13-18; 12:21-13:3.

### B. Defendant's Corrective Actions

Defendant has a progressive counseling and corrective action policy pursuant to which employees receive counseling corrective actions ("CCAs") for engaging in unacceptable conduct. Doc. 67-8 at 2. On March 3, 2017, Plaintiff received a CCA after he told an operational manager

---

[1] The resolution of this motion was significantly complicated by the sheer volume and breadth of the facts asserted in this action, many of which were neither discussed nor analyzed in any meaningful way, and by the number of unsupported and improper objections to those facts. The Court does not address each objection but has carefully analyzed the summary judgment record and considers only those uncontroverted facts required to reach its decision and construes those facts in the light most favorable to Plaintiff as the nonmoving party.

("OM"): "I'm tired of people acting like I don't know what the fuck I am doing. I have been here for too long to be told what to do like I don't know anything." Doc. 67-10 at 2, Doc. 67-1 at 25:12-14; 26:20-27:10. Less than two months later, on April 28, 2017, Plaintiff received a second CCA because he failed to report for a scheduled half day of work or call in his absence. Doc. 67-1 at 28-29. Plaintiff subsequently met with Human Resource ("HR") Business Partner Haley Catterson concerning his second CCA and, a few minutes after the meeting, she found him in the breakroom sitting down and using his cell phone outside of break time. Doc. 67-1 at 30:23-31:12. Plaintiff explained that his badge to get into the warehouse had malfunctioned. Doc. 67-1 at 30:13-16. But he neglected to use the HR radio or the phone in the breakroom to call to be let into the warehouse. Doc. 67-1 at 30:13-31:7; Doc. 67-12. On May 9, 2017, Plaintiff received a third CCA based on the incident for "loafing." Doc. 67-1 at 29:13-16; Doc. 67-13.

Each of Plaintiff's three CCAs provided that, for a six-month period, Plaintiff was ineligible for transfer (except under limited circumstances with HR approval) and ineligible for promotion. Doc. 70-4 at 35, 39-41. And because the "loafing" CCA was Plaintiff's third within a twelve-month period, he also received a final warning, which extended his ineligibilities for transfer and promotion from six months to a year. *Id.* at 37. The final warning also added the possibility of termination if he incurred another CCA. *Id.*

### C. Plaintiff's Complaints and Leave of Absence

After Plaintiff received the final warning, he made a complaint through Defendant's integrity hotline claiming Defendant issued him the CCAs in retaliation for his FMLA use. Doc. 67-16. On May 17, 2017, Paul Palazzo, a lead labor relations consultant for Defendant, interviewed Plaintiff in connection with his complaint. Doc. 67-15 at 6:13-17. Plaintiff claimed his OMs talked to him about his FMLA leave in December 2016 and in 2014 and 2015. He thought they retaliated

against him specifically because he had complained about their comments regarding his FMLA leave. Doc. 67-15 at 6:18-9:6; Doc. 67-16.

The day after his interview with Mr. Palazzo, on May 18, 2017, Plaintiff sent an email to HR explaining that he had a diagnosed anxiety disorder. Doc. 67-2 at 16:8-24; Doc. 67-17. In the email, Plaintiff further alleged he had experienced race- and age-based discrimination and FMLA retaliation while working at the Center and, due to this negative work environment—which he claimed had "caused or contributed to [his] anxiety disorder"—he was applying for short term disability to "keep [himself] healthy." *Id.* He stated he would rather be working and wanted to start talking to Defendant about ways to accommodate his disability, so he could work without anxiety. Doc. 67-17. This was the first time Ms. Catterson or Plaintiff's OMs heard about his diagnosis. Doc. 67-2 at 7:12-18, 8:23-9:10; 15:16-21; Doc. 67-9 at 11:7-12:10-18; 14:21-25; 15:3-23; 16:18-17:3; 18:6-11; 30:4-9; Doc. 67-6 at 6 at 3:19-24; Doc. 67-18 at 5:4-8; 5:20-22; Doc. 67-19 at 5:3-17.

On May 26, 2017, Ms. Catterson emailed Plaintiff asking whether he wanted to discuss the issues in the email or wait until he returned from leave. Doc. 67-2 at 17:2-22; 67-20. On May 31, 2017, Mr. Palazzo informed Plaintiff that Defendant had determined that his CCAs were issued according to Defendant's policies—and not in retaliation for his FMLA leave. Plaintiff and Ms. Catterson met in person on June 1, 2017. Doc. 67-2 at 23:2-8. Plaintiff claimed OM David Carlton and a coworker, Randy, wanted to get rid of him. He also provided the names of two employees who had cursed in front of an OM. Doc. 67-2 at 18:8-23. By this point, Plaintiff's doctor had certified that Plaintiff was unable to work due to his anxiety. Doc. 67-1 at 4:21-25. Ms. Catterson told Plaintiff to let her know when he was ready to return to work. Doc. 70-4 at 56.

On July 28, 2017, while still on leave, Plaintiff filed a charge of discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"), claiming continuous retaliation and discrimination since 2010 on the basis of race, age, and disability. Doc. 1-1; Doc. 67-1 at 46:12-19.

### D. Plaintiff's Return to Work

On July 31, 2017, Plaintiff spoke with Ms. Catterson and stated that he might be able to return to work with restrictions. Doc. 67-1 at 8:22-9:2; Doc. 67-2 at 20:13-17. He picked up an "accommodation questionnaire" the next day. Doc. 67-2 at 21:7-24. Plaintiff's doctor released him for work on August 24, 2017 with one restriction: that he not operate order picker machinery. Defendant accommodated this restriction. Doc. 67-1 at 10:4-11:16, 43:11-24. After his return to work, Plaintiff claimed he needed to be able to leave work if he experienced increased anxiety, and his OMs permitted him to do so. *Id.* at 12:21-13:3. He did not ask for any other accommodations. Doc. 67-1 at 41:14-24.

Ms. Catterson followed up with Plaintiff on September 1 and 28, 2017 to see how he was feeling and if he was comfortable at work. Doc. 67-2 at 22:14-23:8. Plaintiff confirmed that he had no concerns regarding his use of FMLA leave or because of his race. Doc. 67-2 at 26:24-27:11; Doc. 67-21 at 2. Plaintiff also admits that, since 2016, no one has used racist language with him, cursed or screamed at him, or touched him offensively at work. Doc. 67-1 at 37:3-39:5.

Plaintiff nonetheless continued to pursue his EEOC action, and, on February 14, 2018, the EEOC issued Plaintiff a notice of right to sue letter. Plaintiff proceeded to file this action on May 11, 2018, asserting claims for disability discrimination and failure to accommodate his disability under the ADA, race-based disparate treatment and harassment under Title VII, and retaliation under the ADA, Title VII, and the FMLA. Doc. 1; Doc. 64 at 14-15.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In applying this standard, courts must view the facts and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.    ANALYSIS

### A.    Counts I-II (ADA)

Counts I and II of the complaint allege Defendant violated the ADA by discriminating against Plaintiff based on his disability (Count I) and failing to accommodate his disability (Count II). Doc. 64 at 13-14. As a threshold matter, the Court addresses whether Plaintiff is disabled within the meaning of the ADA.

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). To satisfy the first test for disability, "a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show that the impairment substantially limits one or more of those activities." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011). The question of whether a plaintiff has a recognized impairment and identifies

one or more major life activities are questions of law for the court, and the question of whether an impairment substantially limits a major life activity is generally a question of fact for the jury. *Id.*

Here, Defendant does not contest that Plaintiff has a recognized impairment of generalized anxiety disorder. *See* U.S. EEOC, EEOC ENFORCEMENT GUIDANCE ON THE AMERICANS WITH DISABILITIES ACT AND PSYCHIATRIC DISABILITIES (2008) (listing anxiety disorders as a mental impairment under the ADA). And Defendant also does not appear to contest that Plaintiff has identified a number of major life activities affected by that disorder, including self-care, sleeping, concentrating, thinking, communicating, and working. *See* 29 C.F.R. § 1630.2(i)(1)(i) (defining "major life activities" as including activities such as "caring for oneself," "performing manual tasks," "concentrating," "thinking," "interacting with others," and "working"). Instead, Defendant argues the record does not include any evidence establishing that Plaintiff is substantially limited in those major life activities.

The Court disagrees, and, for the following reasons, finds there is a genuine issue of material fact regarding whether Plaintiff's generalized anxiety disorder "substantially limits" one or more of his major life activities. The Court notes that the applicable regulations dictate the term "substantially limits" be construed broadly and that the determination of whether an impairment substantially limits a major life activity requires an individualized assessment. *See* 29 C.F.R. § 1630.2(j)(1)(i), (iv); *Vannattan v. VendTech-SGI, LLC*, 2017 WL 2021475, at *3 (D. Kan. 2017). Here, Plaintiff cites The Diagnostic and Statistical Manual of Mental Disorders for the symptoms of generalized anxiety disorder, which include: difficulty concentrating, irritability, and "clinically significant distress or impairment in life functions." Doc. 70-2 at 32. The doctor who diagnosed Plaintiff, Dr. Barnett, testified that a panic attack (such as those experienced by Plaintiff) can limit an individual in performing life functions such as walking, eating, sleeping, thinking,

concentrating, breathing, driving, or working. Doc. 70-1 at 54:10-17. He explained that "panic attacks can cause patients to be unable to focus on anything but their fear" and "they may or may not be able to drive, work, and so forth," but clarified that these symptoms would just be during the time the individual was experiencing the panic attacks. *Id.* at 54:18-24. Dr. Barnett further testified that Plaintiff reported experiencing symptoms of feeling "keyed up," fatigued, and irritable. *Id.* at 56:14-25. Dr. Barnett agreed that irritability could involve difficulty in social interactions, including difficulty in the workplace, difficulty interacting with coworkers and supervisors, and difficulty receiving criticisms. *Id.* at 57:1-16. In sum, Dr. Barnett testified regarding Plaintiff's diagnosis of generalized anxiety disorder, the symptoms of generalized anxiety disorder, and how those symptoms generally limit major life activities.

Plaintiff himself also testified in detail regarding the symptoms he experiences; i.e., the physical and mental effects he thinks and feels based upon his own perceptions. Plaintiff testified he has experienced fatigue, restlessness, feeling "keyed up" or on edge, irritability, difficulty in social interactions, difficulty in the workplace, and difficulty interacting with his coworkers and OMs. Doc. 70-1 at 7, 20, 24, 55-56. He testified that, when he is experiencing a panic attack, he is essentially incapacitated. Doc. 70-1 at 48. These symptoms can impede Plaintiff from being able to work, drive, and operate machinery.[2] Doc. 70-1 at 21, 54:1-20.

Taking all of this into consideration—and, again, broadly construing the term "substantially limits" as required by the applicable regulations—the Court finds there is a question

---

[2]     In its reply, Defendant cites to *Wedel v. Petco Animal Supplies Stores, Inc.*, 2015 WL 859072 (D. Kan. 2015), in support of its argument that Plaintiff's evidence is insufficient to establish he is disabled under the ADA. But the Court finds *Wedel* is distinguishable from the circumstances here. In *Wedel*, the court entered summary judgment against a plaintiff diagnosed with Crohn's disease, finding that the plaintiff had not testified to any substantial limitations. *Id.* at 3. The plaintiff's only testimony, based on her individual experience, was that she needed additional bathroom breaks and time off for doctor's appointments. *Id.* She provided no evidence regarding either the number or urgency of those breaks. *Id.* Unlike in *Wedel*, however, here Plaintiff has testified in detail regarding the symptoms he experiences.

of fact regarding whether Plaintiff's diagnosed generalized anxiety disorder substantially limits one or more of his major life activities. The Court's finding that Plaintiff is disabled obviates the need to address whether Plaintiff has a record of impairment or was regarded as impaired for purposes of his claims of disability discrimination and failure to accommodate. Having determined Plaintiff is disabled, the Court proceeds to its analysis of Counts I and II.

### 1.    Disability Discrimination

The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In the absence of direct evidence of discrimination, ADA disability discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting scheme. *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896 (10th Cir. 2017).[3]

Under *McDonnell Douglas*'s three-part analysis, a plaintiff must first establish his prima facie case of ADA discrimination. *Id.* The plaintiff's burden at the prima facie stage of the analysis is not onerous, and only a minimal showing is necessary. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013); *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966-67 (5th Cir. 1999). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate legitimate, non-discriminatory reasons for its adverse employment actions. *Williams*, 849 F.3d at 896. If the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reasons for its actions are mere pretext for discrimination. *Id.*

As set forth above, in its motion for summary judgment, Defendant first contends that Plaintiff cannot establish a prima facie case for disability discrimination. Defendant next contends

---

[3]    Neither party appears to dispute the applicability of the *McDonnell Douglas* framework to Plaintiff's disability discrimination claim, and, regardless, the Court finds that Plaintiff has not presented any direct evidence of disability discrimination to justify deviating from that framework.

that, even if Plaintiff could establish his prima facie case, he cannot show Defendant's legitimate, nondiscriminatory reasons for its adverse actions (administering the CCAs) were mere pretext for discrimination. Pursuant to the *McDonnell Douglas* burden-shifting scheme, the Court first analyzes whether Plaintiff can establish his prima facie case.

### a. Prima Facie Case

To establish a prima facie case of ADA disability discrimination, the plaintiff must show: (1) he either is disabled or perceived as disabled under the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he suffered discrimination because of his disability. *Williams*, 849 F.3d at 896. The plaintiff endures "discrimination" within the meaning of the third prong when he suffers an adverse employment action because of his disability. *Id.*

The Court previously found that Plaintiff meets the first element of his prima facie case (that he is a disabled person under the ADA). And Defendant does not contest that Plaintiff is qualified to perform the essential functions of his position. The Court therefore proceeds to the third element of Plaintiff's prima facie case: whether he suffered discrimination because of his disability. In its motion for summary judgment, Defendant argues Plaintiff can show neither an adverse action against him nor disparate treatment. Although the Court finds adverse actions were taken against Plaintiff, it finds no causation between the adverse actions and Plaintiff's disability.

To qualify as adverse, an employer's action must result in "a significant change in employment status," such as termination, failure to promote, or ineligibility for things like promotions. *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 934 (10th Cir. 2001). Courts in this District have held that written warnings and evaluations making employees temporarily ineligible for transfer or promotion sufficiently impact their future employment opportunities to give rise to an

adverse employment action. *See Budenz v. Sprint Spectrum, L.P.*, 230 F. Supp. 2d 1261, 1276 (D. Kan. 2002).

Here, Plaintiff received three CCAs in March, April, and May 2017. Each of the CCAs provided that, for a six-month period, Plaintiff was ineligible for transfer except under limited circumstances—i.e., with HR approval—and ineligible for promotion. Doc. 70-4 at 35, 39, 41. Because Plaintiff received three CCAs within a year, he also received a final warning that extended those ineligibilities from six months to a full year and added the possibility of termination if he incurred another CCA. *Id.* at 37. Both Plaintiff's CCAs and his final warning constitute adverse employment actions. *See Budenz*, 230 F. Supp. 2d at 1276.

But, although Defendant took adverse action against Plaintiff, all three CCAs and the final warning occurred <u>before</u> Plaintiff sent his May 18, 2017 email notifying Defendant of his disability. Doc. 67-17. To establish that he suffered adverse employment actions <u>because of</u> his disability, Plaintiff must come forward with some evidence from which a reasonable jury could find that Defendant was aware of his disability at the time it issued the CCAs. As proof of Defendant's awareness, Plaintiff points to management's descriptions of him as "defensive," having "bad interaction[s]" with his coworkers, and "not being open to feedback." Doc. 71-1 at 3-4. Additionally, Plaintiff references management and HR's suggestions that he collect his thoughts before sharing feedback, consider his body language, role play with his OMs, and approach situations in a positive way. *Id.* at 3-5, 9. But this feedback demonstrates merely that management thought him irritable, not that it thought him disabled.[4]

---

[4]     Defendant correctly challenges Doc. 71-1 as not authenticated, *see Bell v. City of Topeka, Kan.*, 496 F. Supp. 2d 1182, 1184 (D. Kan. 2007), *aff'd sub nom.*, 279 F. App'x 689 (10th Cir. 2008), but the Court considered the comments for the sake of argument.

Plaintiff also cites his FMLA leave as evidence of Defendant's knowledge of his disability. Although Plaintiff called in to the Center when he was taking FMLA leave, neither he nor The Reed Group informed Defendant of his underlying medical condition. Doc. 67-2 at 33:5-14; Doc. 67-9 at 10:13-22. Employees can elect to take FMLA leave for a variety of reasons, including medical leave, the birth or adoption of a child, or the care of an immediate family member with a serious health condition. 29 U.S.C. § 2601(b)(2). Plaintiff's feedback and the mere fact that he took FMLA leave are not enough to satisfy Plaintiff's summary judgment burden and show evidence from which a reasonable jury could find Defendant was aware of his disability. *Cf. O'Neal v. Centene Mgmt. Co., LLC*, 2018 WL 4637270, at *16 (D. Kan. 2018) (finding an employee's taking of FMLA leave through a third-party administrator was insufficient to show the employer knew of a disability). Therefore, Plaintiff has not established a prima facie case of discrimination.[5]

### b. Pretext

Having found that Plaintiff has not established his prima facie case, the Court need not proceed with the remainder of the *McDonnell Douglas* analysis. But even assuming Plaintiff had demonstrated a prima facie case, his claim nonetheless fails because Defendant has put forth legitimate, nondiscriminatory reasons for Plaintiff's CCAs, and Plaintiff has not shown that Defendant's stated reasons are pretext for intentional discrimination.

---

[5] Plaintiff was also denied two specialty jobs that give employees different responsibilities in the warehouse. For one position, he was told that he was not fit for the position because he needed improvement in teamwork and in communicating with his peers, and, further, that he had a bad attitude. Doc. 70-4 at 52-53. Defendant contends these are time barred. Because Plaintiff never meaningfully responded to this argument, the Court finds Plaintiff waived those claims. Regardless, and even assuming denial of these jobs qualified as adverse actions, the Court agrees that Plaintiff is time-barred from raising them. A plaintiff must exhaust his administrative remedies with respect to each discriminatory act before proceeding in federal court. *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003). A plaintiff has 300 days from the date of an incident to file a charge with the EEOC. *Id.* at 1210-11. Here, Plaintiff filed his Charge on July 28, 2017 (Doc. 1-1)—well beyond the 300-day time limit to include his assertion regarding the denial of the specialty jobs. Therefore, the Court does not consider these allegations in its analysis.

Here, Defendant identifies Plaintiff's violations of three separate company policies as legitimate reasons for the CCAs. Defendant explains that Plaintiff received his first CCA in March 2017 because he told an OM: "I'm tired of people acting like I don't know what the fuck I am doing. I have been here for too long to be told what to do like I don't know anything." Doc. 67-10 at 2; Doc. 67-1 at 25:12-14; 26:20-27:10. Plaintiff received his second CCA because he failed to report for a scheduled half-day of work and did not call in his absence. Doc. 67-1 at 28-29. And Plaintiff received his third CCA after Ms. Catterson found him in the breakroom sitting down and looking at his cell phone outside of break time. Doc. 67-1 at 30:23-31:12. Such violations of company policy are legitimate reasons for an adverse employment action. *See Thompson v. Exide Techs.*, 2011 WL 5553671, at *13 (D. Kan. 2011) (finding the defendant met its burden to offer a legitimate, nondiscriminatory reason for the plaintiff's termination where the defendant maintained the plaintiff was terminated due to violation of a workplace violence policy). Defendant has therefore satisfied its burden under the second prong of the *McDonnell Douglas* framework.

And because Defendant offers legitimate, non-discriminatory reasons for its adverse employment actions, the burden reverts to Plaintiff to show the proffered explanations are "more likely" pretexts for discrimination. *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007). Plaintiff has not carried that burden. Typical avenues for demonstrating pretext include providing evidence that (1) the stated reason is false, (2) the defendant acted contrary to its written policies, and (3) the plaintiff was treated differently than similarly-situated employees. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). In analyzing a plaintiff's claim of pretext, courts examine the facts as they appear to the individual making the adverse employment decision; the court's role is not to "second guess" the employer's business judgment. *Id.*; *see also Young v.*

*Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("[O]ur role is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."). Nor is the court's role to ask whether the decision was wise, fair, or correct. *Dewitt*, 845 F.3d at 1307. Rather, the court must determine whether the employer honestly believed the legitimate, non-discriminatory reason it gave for its conduct and acted in good faith on that belief. *Id.* Mere conjecture that the employer's explanation is pretext is not enough to justify denial of summary judgment. *Id.*

In support of his pretext argument, Plaintiff devotes two pages of his briefing to citations to the law on pretext but offers <u>no</u> citations to the record. And the Court will not sift through Plaintiff's 190 statements of additional fact to find evidence to support his pretext argument. It is his responsibility to connect the facts to his legal conclusion. *Triple-I Corp. v. Hudson Assocs. Consulting, Inc.*, 713 F. Supp. 2d 1267, 1274 (D. Kan. 2010). For this reason, Plaintiff fails to carry his summary judgment burden on this issue.

Even if the Court looks to other portions of Plaintiff's brief in an attempt to decipher his argument, Plaintiff still does not carry his burden. For example, Plaintiff notes in another section of his brief that he overheard another employee ask OM Carlton why Plaintiff still worked at the Center because he was gone all the time. OM Carlton responded that Plaintiff would "not be around much longer." Doc. 70-4 at 33, 54. Plaintiff's first CCA followed three months later.[6] But the evidence shows OM Carlton's comment was in response to an observation regarding Plaintiff's frequent absences. He gave no indication of discriminating against Plaintiff based on his disability. Regardless, OM Carlton did not issue any of the CCAs. *Id.* at 35-41. One stray comment by an

---

[6] During his deposition, Plaintiff testified he overheard this conversation around the time he was diagnosed with generalized anxiety disorder, which was at the end of 2014. Doc. 70-1 at 48. But Plaintiff's statement of facts states that the conversation took place in December 2016. The Court construes the facts most favorably to Plaintiff.

individual uninvolved in the adverse action does not demonstrate pretext. *Cf. Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 763 (10th Cir. 2017) (noting that stray racial comments should typically not be considered in a discrimination case, unless the plaintiff can link them to personnel decisions or to the individuals making the personnel decisions).

As another example, Plaintiff also challenges the validity of the CCAs themselves. After receiving his CCA for cursing, Plaintiff reported two other employees who had cursed in front of other OMs and who, he believes, did not receive CCAs. He did not provide their full statements or even the full identity of one of the individuals. Doc. 70-3 at 50; Doc. 70-1 at 32. Plaintiff has not presented sufficient evidence to demonstrate that these other employees were similarly situated to him. As to his CCA for failing to clock in or call in for work, Plaintiff explains that he told management he was taking the full day off and thought it would be reflected in the schedule. Doc. 70-2 at 42. He does not actually dispute that the schedule reflected that he would work a half-day and that it was his responsibility to check his schedule. Doc. 70-4 at 41. The OM that issued the CCA, OM Clayton Metzger, testified that he had issued CCAs to employees for not clocking in per the schedule, even when they believed they had told him they would be taking vacation. He could not recall a specific employee's name. Doc. 70-4 at 74. Although Plaintiff demonstrates a misunderstanding, he does not demonstrate that the CCA was erroneously given or that this CCA is a pretext for discrimination. Finally, Plaintiff challenges the CCA for "loafing," explaining there was no one present to let him into the warehouse, so he went to the breakroom to check the time on his phone, which is when Ms. Catterson appeared. Doc. 70-3 at 30. Defendant defines "loafing" as a significant lack of attention to responsibilities (e.g., sleeping, reading, excessive personal communications, and excessive internet browsing). Doc. 70-4 at 35. Plaintiff cites two cases of CCAs issued for more egregious loafing (Doc. 71-10 at 4, 8) but no case of loafing where the

employee did not receive a CCA, let alone a case where a similarly-situated employee did not receive a CCA. For all of these reasons, Plaintiff has not come forward with evidence from which a reasonable jury could find pretext, and the Court accordingly grants summary judgment on Plaintiff's claim of disability discrimination.

### 2. Failure to Accommodate

The Court now turns to Plaintiff's failure to accommodate claim. The ADA provides a cause of action for disabled employees whose employers fail to reasonably accommodate them. 42 U.S.C. § 12112(b)(5)(A). Failure to accommodate claims are not analyzed under the *McDonnell Douglas* framework; rather, the Tenth Circuit has developed a modified burden-shifting framework under which courts are to assess such claims. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017).

Under this modified framework, the plaintiff must first establish a prima facie case: (1) that he is disabled under the ADA, (2) that he is "otherwise qualified," and (3) that he requested a "plausibly reasonable accommodation." *Id.* Once the plaintiff makes this showing, the burden shifts to the employer to present evidence either rebutting one or more elements of the prima facie case or establishing an affirmative defense. *Id.* If the employer does either of these things, summary judgment is appropriate unless the plaintiff can produce evidence establishing a genuine dispute regarding the affirmative defenses or rehabilitates any of the challenged elements of his prima facie case. *Id.*

With respect to the first element, as discussed above, Plaintiff has established a genuine dispute as to whether he is disabled. And, as to the second element, Defendant does not dispute that Plaintiff is otherwise qualified for his job. Accordingly, the Court focuses its analysis on the third element. Defendant argues it had to know of Plaintiff's disability to be held liable for failure

to accommodate. It further argues it accommodated Plaintiff when he notified HR of his disability. Plaintiff does not assert that the specific accommodations he requested were not granted. Instead, he argues: (1) Defendant knew of his disability well before his email but failed to accommodate him; (2) Defendant should not have waited until late August 2017 to grant him an accommodation after his email; and, finally, (3) Defendant never fully engaged in an interactive process with him and failed to fully accommodate him. The Court disagrees on all points.

An employee must inform his employer of his disability and requested accommodation, or the disability must be "obvious," before the employer can be held liable for a failure to accommodate. *Ewing v. Doubletree DTWC, LLC*, 673 F. App'x 808, 810-14 (10th Cir. 2016). Upon learning of the disability, the employer has a duty to engage in an interactive process to determine the employee's precise limitations and reasonable accommodations. *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004). Here, on May 18, 2017, Plaintiff emailed HR asking for "a way to accommodate my disability so I can work without having anxiety." Doc. 67-17. The Court has already found that Plaintiff has not demonstrated a genuine issue that Defendant knew of his disability before he sent this email expressly informing HR. Therefore, the Court rejects Plaintiff's first theory of liability because Plaintiff has failed to come forward with evidence from which a reasonable jury could find that Defendant knew of his disability before the May email and failed to accommodate him.

Turning to Plaintiff's other two theories, Defendant had an interactive process in place directing HR to provide a disabled employee with a copy of the employee's job description and an accommodation questionnaire for the employee's medical provider to complete. Doc. 71-2 at 1. Upon receiving the questionnaire, HR is directed to have an "interactive dialogue" to discuss the employee's listed restrictions and implement accommodations. *Id.* at 4-6. In the present case,

Plaintiff was on leave by the time he sent the May email notifying Defendant of his disability and desire for an accommodation. Doc. 67-17. On May 26, 2017, Ms. Catterson emailed Plaintiff asking whether he wanted to discuss the issues in his email or wait until he returned from leave. Doc. 67-2 at 17:2-22; Doc. 67-20. They met in person on June 1, 2017. Doc. 67-2 at 23:2-8. By that time, Plaintiff's doctor had certified that he was unable to work. Doc. 67-1 at 4:21-25. Rather than complete the interactive process then, Ms. Catterson told Plaintiff to let her know when he was ready to return to work. Doc. 70-4 at 56.

On July 31, 2017, Plaintiff spoke with Ms. Catterson and told her he might be able to work with restrictions. Doc. 67:1 at 8:22-9:2; Doc. 67-2 at 20:13-17. He picked up an accommodation questionnaire the next day. Doc. 67-2 at 21:7-24. Plaintiff was released for work on August 24, 2017, with one restriction: that he not operate order picker machinery, which Defendant accommodated. Doc. 67-1 at 10:4-11:16; 43:11-24. And after his return to work, Plaintiff claimed he needed to be able to leave work if he experienced increased anxiety, and Defendant permitted him to do so. *Id.* at 12:21-13:3. He did not ask for any other accommodations. Doc. 67-1 at 41:14-24. Ms. Catterson followed up with Plaintiff on September 1 and 28, 2017 (Doc. 67-2 at 22:14-23:8), and Plaintiff raised no concerns regarding his accommodations. Doc. 67-2 at 26:24-27:11; Doc. 67-21 at 2.

On the record before the Court, the Court is satisfied that the parties engaged in a full interactive process when Plaintiff was ready to resume work and Defendant granted him every specific accommodation he requested. Plaintiff does not identify any specific plausibly reasonable accommodation that he requested and which Defendant denied.[7] Accordingly, Plaintiff has not

---

[7] Plaintiff briefly mentions that he sought an accommodation to be moved to another line. But a vague, informal, and non-specific request does not qualify as a request for a plausibly reasonable accommodation. *See Skerce v. Torgeson Elec. Co.*, 2019 WL 3801721, at *8-9 (D. Kan. 2019).

shown a prima facie case so the Court grants Defendant's summary judgment motion on Plaintiff's failure to accommodate claim.

**B.      Count III (Title VII)**

Count III of Plaintiff's complaint alleges race-based disparate treatment and harassment in violation of Title VII. In its motion for summary judgment, Defendant argues Plaintiff cannot establish a prima case of race discrimination because he did not suffer an adverse employment action, and, alternatively, he cannot establish pretext. Defendant also argues that Plaintiff's alleged instances of racial harassment are untimely and, alternatively, that Plaintiff cannot establish pretext. The Court agrees that summary judgment is warranted on both of Plaintiff's Title VII claims.

**1.      Race-Based Disparate Treatment**

Because Plaintiff has only indirect or circumstantial evidence of race-based disparate treatment, the *McDonnell Douglas* burden-shifting framework applies. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).[8] Under this framework, an employee must first demonstrate a prima facie case of discrimination. Once an employee establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer can do so, the burden shifts back to the employee to demonstrate that the proffered reasons are pretext. *Id.*

The Court first considers Plaintiff's prima facie case. To demonstrate a prima facie case of discrimination, a plaintiff must establish: (1) he was a member of a protected class; (2) he suffered an adverse employment action; and (3) the circumstances give rise to an inference of

---

[8]      As with Plaintiff's disability discrimination claim, the parties do not appear to dispute the applicability of the *McDonnell Douglas* framework to Plaintiff's race-based disparate treatment claim.

discrimination. *See Stockdale v. Marriott Int'l*, 2013 WL 5304012, at *3 (D. Kan. 2013) (citing *PVNF, L.L.C.*, 487 F.3d at 800). Here, Plaintiff is black, making him a member of a protected class and satisfying the first element of his prima facie case. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 527 (1993). As to the second element, Plaintiff suffered adverse employment actions via his receipt of the CCAs. *See supra* Part III.A.1.a. Finally, with respect to the third element—circumstances giving rise to an inference of discrimination—Plaintiff alleges he has been subjected to scrutiny due to his race. He alleges that he and another black employee were questioned about their interactions with a white intern when white employees involved were not questioned. Doc. 70-1 at 46-47. He also explains that less experienced white men received specialty jobs over him. He was told he was rude and intimidating when critiquing others' job performance, yet white employees saying the same things were not told they were rude. Doc. 70-4 at 53. He also claims there have been numerous occasions when white employees were permitted to stand around and talk while minorities were told to work. Doc. 70-4 at 52-53. Thus, the Court finds Plaintiff has satisfied his light burden to show a prima facie case.

Because Plaintiff satisfies his prima facie showing, the burden shifts to Defendant to come forward with a legitimate, non-discriminatory explanation for its actions. Defendant identifies Plaintiff's violations of three separate company policies as legitimate reasons for the CCAs. Therefore, the burden shifts back to Plaintiff to show pretext. And for the reasons previously stated, *supra* Part III.A.1.b, Plaintiff has not shown these legitimate, nondiscriminatory reasons for issuing him the CCAs were pretextual. Stated differently, Plaintiff has not come forward with evidence from which a reasonable jury could find that Defendant's reasons for issuing the CCAs are pretext for race discrimination. Accordingly, Defendant is entitled to summary judgment on this claim.

## 2. Race-Based Harassment

Plaintiff also asserts a race-based harassment claim. To establish a prima facie case of race-based harassment, Plaintiff must prove: (1) he is a member of a protected group; (2) he was harassed; (3) the harassment was racial in nature; and (4) the severity or pervasiveness of the discriminatory intimidation, ridicule, or insults altered a term, condition, or privilege of Plaintiff's employment and created an abusive working environment. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1170 (10th Cir. 2018). Although Defendant concedes that Plaintiff is a member of a protected group, Defendant contends that Plaintiff cannot show the remaining three elements because he cannot identify any timely race-based harassment that he experienced.[9]

Before bringing a claim in federal court, a plaintiff asserting race-based harassment must exhaust his administrative remedies. *Al-Ali v. Salt Lake Cmty. Coll.*, 269 F. App'x 842, 846 (10th Cir. 2008). A plaintiff exhausts his claims by filing a charge with the EEOC, and a plaintiff has 300 days from the date of an incident to file this charge. *Id.* Plaintiff filed his charge on July 28, 2017 (Doc. 1-1), so he must identify at least one act of racial harassment that occurred within 300 days preceding July 28, 2017. *Id.*

Although Plaintiff alleges a pattern of harassment for almost twenty years, he fails to identify any timely instances of race-based harassment. *See* Doc. 70 at 84. He identifies an incident in 2008 where he "thought" a coworker called him a racial slur, which the coworker immediately denied. Doc. 71-3 at 2. He also identifies a 2015 incident involving a white intern (Doc. 70-1 at 46-48) and other instances that admittedly occurred a "few years" before his charge. *See, e.g.*, 70-4 at 53 (identifying in his July 28, 2017 charge an incident that occurred "[a] few years ago"). All

---

[9] Although framed as a failure to show a prima facie case, the outcome is the same if considered as an affirmative defense of failure to exhaust. Defendant has argued that Plaintiff lacks any timely and exhausted instances of race-based harassment, and Plaintiff does not come forward with any evidence indicating a triable issue on this fact. Thus, Defendant is entitled to summary judgment under either analysis.

these instances of alleged harassment occurred well beyond the 300-day time limit. Consequently, Plaintiff's allegations of race-based harassment are untimely and the Court, therefore, grants summary judgment in Defendant's favor on Plaintiff's Title VII race-based harassment claim.[10]

### C.    Counts IV-VI (Retaliation)

Finally, the Court addresses Plaintiff's retaliation claims. Plaintiff argues Defendant unlawfully retaliated against him in violation of the ADA, Title VII, and the FMLA. Title VII, the ADA, and the FMLA all prohibit employers from discriminating against employees for opposing actions prohibited by the statutes. *See* 42 U.S.C. §§ 2000e-3(a), 12203(a); 29 U.S.C. § 2615(a)(2). Each of Plaintiff's claims for retaliation is subject to the *McDonnell Douglas* burden-shifting framework. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).[11] Again, under that framework, Plaintiff must first establish a prima facie case of retaliation. *Id.* Then the burden shifts to Defendant to offer legitimate, non-discriminatory reasons for its adverse employment actions. *Id.* If Defendant can do so, the burden shifts back to Plaintiff to demonstrate the existence of a genuine issue of material fact that Defendant's proffered reasons are pretext. *Id.*

In its motion for summary judgment, Defendant argues Plaintiff cannot establish a prima facie case on any of his retaliation claims because he fails to show that his protected activity was the cause of any adverse employment action. And, even if Plaintiff can establish a prima facie case, Defendant contends it is still entitled to summary judgment because Plaintiff cannot show that its asserted reasons for any adverse actions were mere pretext. Pursuant to the *McDonnell*

---

[10]   The Court notes that Plaintiff admitted in his deposition that since 2016 no one has used racist language with him, cursed or screamed at him, or touched him offensively. Doc. 67-1 at 208-10.

[11]   As with the other claims, the parties do not appear to dispute the applicability of the *McDonnell Douglas* framework to Plaintiff's retaliation claims.

*Douglas* burden shifting scheme, the Court first analyzes whether Plaintiff can establish his prima facie case.

### 1.    Prima Facie Case

To establish a prima facie case of retaliation under either the ADA, Title VII, or the FMLA, a plaintiff must show: (1) he engaged in protected activity; (2) he suffered an adverse employment action during or after his protected activity, which a reasonable employee would have found materially adverse; and (3) there was a causal connection between the protected activity and the adverse action. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018) (ADA claim); *Tabor*, 703 F.3d at 1219 (Title VII claim); *Metzler*, 464 F.3d at 1170 (FMLA claim). An adverse action is one that might have dissuaded a reasonable employee from engaging in the protected activity. *Lara v. Unified Sch. Dist. #501*, 2008 WL 11378842, at *6 (D. Kan. 2008), *aff'd sub nom.*, 350 F. App'x 280 (10th Cir. 2009).

Defendant concedes that Plaintiff engaged in activity protected by the ADA and Title VII when he made the hotline complaint and emailed HR about the alleged discrimination. It further concedes he engaged in protected activity when he used his FMLA leave. Accordingly, the Court turns to the second and third elements of a prima facie case.

The Court has already found Plaintiff suffered adverse employment actions when he received the three CCAs. *See supra* Part III.A.1.a. But Defendant argues Plaintiff cannot demonstrate causality between the CCAs and his protected activity under the ADA and Title VII because the CCAs occurred <u>before</u> he made the hotline call and sent the email to HR. Plaintiff does not respond to this argument. Accordingly, the Court finds no genuine issue of material fact on this issue and grants summary judgment in Defendant's favor on Plaintiff's ADA and Title VII retaliation claims. *See Lancaster v. Sprint/United Mgmt. Co.*, 670 F. App'x 984, 985 (10th Cir.

2016) (finding plaintiff waived retaliation claim by not responding to defendant's summary judgment arguments on the matter).

This leaves Plaintiff's FMLA retaliation claim. Plaintiff does demonstrate causality between the CCAs and his FMLA usage. Plaintiff alleges that, after he began taking FMLA leave in 2013, his OMs began to document his performance in addition to annual performance reviews. He experienced negative comments regarding his FMLA usage from managers and coworkers, including coworkers stating that management wanted to get rid of him. Doc. 70-1 at 44; Doc. 70-4 at 15, 24, 54. The Court finds that Plaintiff has satisfied his light burden at this prima facie stage on his FMLA retaliation claim.

### 2. Pretext

Because Plaintiff presents a prima facie case of FMLA retaliation, Defendant must come forward with legitimate, nonretaliatory reasons for its adverse employment actions (the CCAs). This Court previously found that Defendant has met that burden. Therefore, the burden shifts to Plaintiff to show that the CCAs were mere pretext for retaliatory intent. Aside from his challenges to the CCAs—which have already been discounted in Part III.A.1.b, above—Plaintiff also cites the discussion between his coworker and OM Carlton, during which the coworker inquired why Plaintiff still worked for Defendant since he was gone all the time. OM Carlton replied that Plaintiff would "not be around much longer." Doc. 70-4 at 33, 54. Reading the facts most favorably to Plaintiff, the Court finds the discussion occurred within four months of the first CCA. *See supra* note 6.

Unlike Plaintiff's ADA discrimination claim, OM Carlton's comment concerns the protected activity in question (i.e., FMLA usage). Nevertheless, this was still a stray comment by a supervisor who did not issue the CCAs. *Cf. Sotunde*, 716 F. App'x at 763 (noting that stray racial

comments should typically not be considered in a discrimination case, unless the plaintiff can link them to personnel decisions or the individuals making the personnel decisions). OM Carlton's stray comment does not establish a genuine dispute regarding pretext. Therefore, the Court finds that summary judgment is warranted on Plaintiff's FMLA retaliation claims. Accordingly, the Court grants summary judgment in Defendant's favor on Plaintiff's ADA, Title VII, and FMLA retaliation claims.

## IV.  CONCLUSION

THE COURT THEREFORE ORDERS that Defendant's Motion for Summary Judgment (Doc. 66) is GRANTED.

IT IS SO ORDERED.

Dated: October 29, 2019              /s/  *Holly L. Teeter*
                                     HOLLY L. TEETER
                                     UNITED STATES DISTRICT JUDGE